IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA<br><br>*v.*<br><br>RICHARD TYLER HUNSINGER | Criminal Action No.<br><br>1:22-CR-386-AT |

**The United States' Sentencing Memorandum**

The United States of America, by Ryan K. Buchanan, United States Attorney, and Matthew S. Carrico, Assistant United States Attorney for the Northern District of Georgia, respectfully requests the Court sentence Richard Tyler Hunsinger to 84 months' imprisonment and submit this Sentencing Memorandum in support thereof.

## I.  PROCEDURAL HISTORY

On December 1, 2020, Richard Tyler Hunsinger (the "Defendant") was charged in a three count indictment with: (1) arson in violation of Title 18 United States Code Section 844(f)(1) and 844(f)(2), and Section 2; (2) assault of a federal officer in violation of Title 18, United States Code, Sections 111(a)(1) and (b), and Section 2; and (3) destruction of federal property in violation of Title 18, United States Code, Section 1361, and Section 2. (Doc. 21, 1:20-CR-00466).

On October 24, 2022, the Defendant entered a written guilty plea pursuant to Rule 11(c)(1)(A) & (B) of the Federal Rules of Criminal Procedure, to both counts of a criminal information charging the defendant with: (1) assault of a federal

officer in violation of Title 18, United States Code, Sections 111(a)(1) and (b), and Section 2; and (2) destruction of federal property resulting in damage exceeding the sum of $1,000, in violation of Title 18, United States Code, Section 1361, and Section 2.  The Defendant is scheduled to be sentenced on January 19, 2023, at 2:30 p.m.

## II. SUMMARY OF DEFENDANT'S CRIMINAL CONDUCT

On July 23, 2020, the Defendant, using the Twitter account "Millions of Dead Landlords" posted a virtual flyer, which he shared from another source, which promoted a "Rally Against Fascism – In Solidarity with Portland" which was to take place on July 25, 2020, at the DHS and ICE field offices (the "Field Office") located at 180 Ted Turner Drive in Atlanta, Georgia.  ("PSR ¶ 8).  On the evening of July 25, 2020, the Defendant attended the rally.

The Defendant attended the rally wearing dark pants, a dark long sleeve top, a full face and head covering so that only his eyes were showing, a dark backpack and gloves. (Gov't Exhs. 1 and 3[1]).  By approximately 11:30 p.m. numerous protestors had gathered outside the Field Office and were protesting outside of the fenced-off area in front of the building.  (Doc. 6 at 10-11).  At approximately 11:32 p.m., Federal Protective Services Inspector KC exited the

---

[1] Gov't Exh. 3 is a security video taken from the Field Office on the evening of July 25, 2020, during the relevant time of the crimes alleged against the Defendant.  It is being provided to the Court for review prior to sentencing and will be available to play during the sentencing proceedings at the Court's request.  The government will not fill a copy of the video with its sentencing memo.

Field Office to observe the crowd and security officer GS held the door to the Field Office for KC. (Doc. 6 at 11, Gov't Exhs. 2 and 3). Both officers could be easily seen by members of the crowd. Members of the crowd began shining green lasers at the eyes of the officers and at surveillance cameras. (*Id.*). The officers reentered the building and members of the crowd continued to shine lasers into the building and at the officers. (*Id.*).

Within a minute of the officers reentering the building, members of the crowd began throwing pyrotechnics at the entrance of the building. (Gov't Exh. 3). Approximately two minutes later protestors dressed similarly to Hunsinger, wearing dark clothing and face and head coverings, breached the fences and began vandalizing the building. (*Id.*). Within three minutes, the Defendant had breached the fence and he and others used various objects including rocks and cinder blocks to smash the windows of the front of the Field Office. Individuals continued to throw fireworks and other explosive devices at the Field Office and into the Field Office. (*Id.*). The Defendant carried an explosive device consisting of a glass bottle filled with flammable liquid with a wick stuffed into the opening of the bottle (commonly referred to as a Molotov cocktail) to the front of the building entrance. The defendant then lit the wick of the Molotov cocktail and threw it into the building through one of the broken windows, while the officers remained in the building. (*Id.*). The defendant then walked away and returned approximately a minute later to look inside the building through one of the broken windows. (*Id.*).

The morning after the officers were assaulted and the building was vandalized, on July 26, 2020, at approximately 6:30a.m., law enforcement officers observed an individual believed to be the Defendant and the Defendant's girlfriend Kathryn Richards traveling in Richard's vehicle on Ted Turner Drive. The Defendant was seated in the passenger seat and appeared to be recording the damage to the DHS Building with a cellphone. The Defendant extended his middle finger toward the agents and appeared to mouth the phrase "Fuck You" as Richards' vehicle passed by the building.

That same morning the Defendant reposted videos of the assault on the Field Office on his Twitter account. (PSR ¶ 10).  The Defendant also posted an image of a banner hung on the Field Office during the riot which read "No Homeland, No Security" along with the hammer and sickle symbol commonly associated with international communist political movements.  (*Id.*).  All of these images were posted prior to media outlets reporting on the attack later that same morning. (*Id.*).

Subsequent investigation of the crime scene located a second Molotov cocktail in addition to the one that the Defendant through into the building.  Law enforcement also found a bottle of lighter fluid and a commercial pyrotechnic inside the Field Office.  (PSR ¶ 9).  The pyrotechnic had been modified by the addition of metal nails into the body of the pyrotechnic. (*Id.*).

In the weeks following the attack on the field office, the Defendant retweeted various posts from his Twitter account, including the following:

4

(1) "Minneapolis police have killed again.  Rioting is spreading in the city without hesitation.  They will kill and kill as long as they exist.  If the system cannot stop them, we will.  Time's up."

(2) "Holy fuck this is a major burn shit down moment."  The original tweet was posted by the Twitter account "blue lives splatter."

(3) "The police must be treated as occupiers and engaged with as such.  We are in for the long and hot summer and a year that has still yet to fully unfold."

### III.    Sentencing Guidelines Calculation

The PSR correctly calculates the Defendant's criminal history category as VI, his total offense level as 34, and his custody guideline range as 262 to 327 months.  The Defendant, however, raised five objections to the PSR which, if sustained, would impact the calculation of the Defendant's custody guideline.  The government will address each of those objections below.

### A. THE TERRORISM SENTENCING ENHANCEMENT UNDER § 3A1.4 APPLIES TO THE DEFENDANT'S CONDUCT

The offense to which the Defendant pled guilty, and the relevant conduct as described in this memorandum involved, or were intended to promote, a federal crime of terrorism.  Accordingly, the federal terrorism sentencing enhancement under the U.S. Sentencing Guidelines § 3A1.4 applies.  With this enhancement,

the offense level is increased by 12 levels or to level 32 (whichever is higher), and the defendant's criminal history category becomes a Category VI.

"Federal crime of terrorism" is defined at U.S.S.G. § 3A1.4, app. note 1 and 18 U.S.C. § 2332b(g)(5).  According to this definition, a "federal crime of terrorism" has two components. First, it must be a violation or promote of one of several enumerated statutes. 18 U.S.C. § 2332b(g)(5)(B). Second, it must be "calculated to influence or affect the conduct of government by intimidation or coercion, or to retaliate against government conduct." 18 U.S.C. § 2332b(g)(5)(A).

Here, to apply the enhancement, the Court needs to identify which specific enumerated federal crime of terrorism the Defendant violated, and the Court's findings need to be supported by only a preponderance of the evidence.  *See United States v. Rodriguez*, 398 F.3d 1291, 1296 (11th Cir. 2005).  The Defendant pled guilty to Count Two of the Criminal Information charging him with destruction of government property in violation of Title 18, United States Code, Section 1361.  (Doc. 1 and 3).  A violation of 18 U.S.C. § 1361 is clearly an enumerated federal crime of terrorism under 18 U.S.C. § 2332b(g)(5)(B)(i).

Second, the Court must determine whether the Defendant's violation of the enumerated federal crime of terrorism was "calculated to influence or affect the conduct of government by intimidation or coercion, or to retaliate against government conduct." 18 U.S.C. § 2332b(g)(5)(A).  A district court deciding whether to impose the terrorism enhancement must "resolve any factual disputes" relevant to the enhancement and then, if it finds the requisite intent, should "identify the evidence in the record that supports" that finding. *United*

*States v. Hassan*, 742 F.3d 104 (4th Cir. 2014) (quoting *United States v. Chandia*, 514

F.3d 365, 376 (4th Cir. 2008)).

It is clear that the Defendant's intention in violating 18 U.S.C. § 1361 was "to

influence or affect government conduct."  Prior, to smashing windows of the

Field Office and throwing an explosive device into the building, the Defendant

circulated a flyer which promoted a "Rally Against Fascism – In Solidarity with

Portland" which was to take place on July 25, 2020, at the DHS and ICE field

offices located at 180 Ted Turner Drive in Atlanta, Georgia.  A defendant's

specific intent to influence and retaliate against government conduct can often

"be inferred from the defendant's choice of target."  *United States v. Abu Khatalla*,

314 F. Supp. 3d 179, 198 (D.D.C. 2018)(upholding enhancement based on attack

on US Embassy in Libya).  Here the Defendant specifically chose to throw a

firebomb into a DHS and ICE field office, making his intent clear.  *See United*

*States v. Hasson*, 26 F. 4th 610, 626 (4th Cir. 2022) (targeting of politicians

indicated that acts done for the purpose of coercing the government or retaliating

against the government, sufficient to establish second factor under the terrorism

enhancement); *United States v. McDavid,* 386 Fed. App'x 365, 372 (9th Cir. 2010)

(upholding terrorist enhancement where bombing target was federal

environmental facility and federal dam); *United States v. Dye*, 538 Fed. App'x 654,

666 (6th Cir. 2013) (upholding the terrorism enhancement for firebombing a

bailiff's office); *United States v. Tubbs*, 290 Fed. App'x 66, 68 (9th Cir.

2008)(upholding terrorist enhancement where sought to burn a U.S. Forest

Service ranger station).  *See also United States United States v. Christianson*, 586 F.3d

532 (7th Cir. 2009)(upholding application of terrorist enhancement two defendants convicted of destroying Forest Service property); *United States v. Harris*, 434 F.3d 767, 773 (5th Cir. 2005)(upholding application of terrorist enhancement for defendant who threw a Molotov Cocktail into a city municipal building); *United States v. Mandhai*, 375 F.3d 1243, 1250 (11th Cir. 2004) (upholding application of terrorist enhancement for defendant who conspired to destroy electrical substations by means of fire or explosives).

Furthermore, the Defendant's adopted statements made both before and after the attack corroborate that he intended to influence or affect government conduct." The flyer the Defendant circulated prior to the attack stated that the purpose of the gathering was to "Rally Against Fascism." Additionally, the Defendant's subsequent Twitter posts where he expressed his disdain for law enforcement, his support of "burn[ing] shit down," and his desire to "engage" with and "stop" law enforcement and government actors through physical confrontation, all reflect on the Defendant's motive when he smashed in the windows of the Field Office and threw an explosive device inside – "to influence or affect the conduct of the government by intimidation or coercion, or to retaliate against government conduct." The Field Office was not attacked randomly, it was attacked because the Defendant and others did not like the conduct of the government, and the Defendant and others were seeking to influence that conduct.

**B.  § 2A2.2 IS THE APPLICABLE GUIDELINE FOR COUNT ONE**

The PSR properly applies § 2A2.2 to arrive at the base offense level for Count One.  First, § 2A2.2 applies to aggravated assault.  § 2A2.2, app. note 1 defines aggravated assault as:

> a felonious assault that involved (A) a dangerous weapon with intent to cause bodily injury (i.e. not merely frighten) with the weapon; (B) serious bodily injury; (C) strangling, suffocating, or attempting to strangle or suffocate, or (D) an attempt to commit another felony.

As both parts (A) and (D) of the aggravated assault definition apply to the Defendant's conduct, § 2A2.2 is properly applied.  First, the Defendant pled guilty to a felonious assault that involved "a dangerous weapon with intent to cause bodily injury (i.e. not merely frighten) with the weapon."  The Defendant threw a firebomb into an occupied building after smashing the windows out.  He did not merely try to frighten the officers with a dangerous weapon, he used the dangerous weapon and was fortunate that no one suffered a catastrophic physical injury as a result. (Doc. 6, at 10-11).  As such, § 2A2.2 was properly applied.  The Defendant argues that the defendant merely obstructed or impeded the officers and thus § 2A2.4 applies.  Not only do the facts not support this argument, but it is also belied by the offense characteristics under § 2A2.4.  § 2A2.4(b)(1) provides for a three-level enhancement "if a dangerous weapon was possessed and its use was threatened."  The guideline here only says if the dangerous weapon "was possessed" and does not contemplate if the dangerous

weapon was used.  That is because once a dangerous weapon is used, such as actually throwing a firebomb, it is clear that an aggravated assault has occurred.

Second, the definition of aggravated assault states that it applies to a felonious assault that involved an attempt to commit another felony.  Here, the assault of the officers occurred while the Defendant committed felony destruction of federal property for which the Defendant pled guilty in Count 2.

Based on either part A or part D of the definition of aggravated assault, it is clear that § 2A2.2 is the appropriate guideline to apply for Count 1 of the information that the Defendant pled guilty to.

## C. THE TWO-LEVEL ENHANCEMENT UNDER § 2A2.2(b)(1) APPLIES

The PSR correctly applies a two-level enhancement under § 2A2.2(b)(1) because the assault involved "more than minimal planning."  Application note two defines more than minimal planning as "more planning than is typical of the offense in simple form" or "if significant steps were taken to conceal the offense." Here, both definitions are met.

As an initial matter, the assault was planned at least two days in advance as evidenced by the flyer circulated by the Defendant on January 23. (PSR ¶ 8). Furthermore, the target of the assault was selected at this time.  This was not an organic protest that somehow turned into an assault and destruction of property. Instead, the Defendant and his accomplices selected the Field Office to send a message.  The timing of the assault also indicates it was planned.  It took place at 11:30 p.m. on a Saturday night.  Again, the Field Office is a federal government building located in downtown Atlanta.  The Defendant and his accomplices new

10

the building would not be open and that there would be a minimal number of people, if any, in that downtown location at that time.   They were not planning a protest where they hoped people would see them, hear their message, and sympathize and join in.  They were planning an attack on the Field Office, and they hoped not to get caught.  The final piece of evidence demonstrating both "more than minimal planning" and "significant steps were taken to conceal the offense" is how the Defendant was dressed that evening.  (Gov't Exh. 1).  On a July evening in Atlanta, GA, the Defendant was dressed in head to toe black, with his head and face covered so that only his eyes showed, and he was wearing gloves.  (*Id.*).  The Defendant contends that he was wearing a mask because of Covid, and that people were supposed to be wearing masks at that time.  (PSR ¶ 18, Objection – Defendant).  This is preposterous.  The Defendant was there to commit a crime, he dressed in a manner to conceal his identity, and this step alone shows "more than minimal planning" and a significant step "to conceal the offense."

### D. THE SIX-LEVEL ENHANCEMENT UNDER § 3A1.2(b) APPLIES

For the six-level enhancement under §3A1.2(b) to apply, the victim of the offense must be a government employee, the offense of conviction must be motivated by such status, and the guideline applicable to the offense of conviction must be found under § 2A.  Here, there is no dispute that the victim of the offense is a government employee, or that the applicable guideline provision is found under § 2A.  The Defendant's objection is that the offense was not motivated by the status of the victims.

The Defendant threw a firebomb into the Field Office when it was occupied by two federal security officers.  It was readily apparent that the building was occupied when the Defendant threw the firebomb into the building.  (Doc. 6 at 11, and Gov't Exhs. 2 and 3).  The Field Office was selected as a target by the Defendant and others because it was a federal building, and particularly an ICE Building.  The victims were in the targeted building working in their capacities as federal employees.  The Defendant's assault of the security officers was most certainly motivated by the victims' status as federal employees.

### E.  § 2K1.4 PROVIDES THE APPLICABLE BASE OFFENSE LEVEL FOR COUNT TWO

The base offense level for violations of 18 U.S.C. § 1361 can be found in § 2B1.1.  § 2B1.1(c)(2) states that if that offense involves arson, or property damage by use of explosives apply § 2K1.4.  Here, the Defendant's conduct involved both arson and use property damage by use of explosives.

As stated repeatedly throughout this memo, the Defendant threw a firebomb into a federal building.  By its very nature this conduct caused damage by use of explosive and involved arson.  The Defendant objects to the application of § 2K1.4 because "destruction of the building was neither intended nor possible with the weapon used."  (PSR ¶ 25, Objection – Defendant).  This objection misses the point.  First, throwing a firebomb into a building necessarily involves arson.  The Defendant's argument that the building had marble floors, marble walls, and a sprinkler system, does not mean that there were not portions of the

building that were flammable.  Second, the Defendant improperly fixates on "destruction" of the building.  § 2K1.4 applies when property damage is cause by an explosive device.  A Molotov Cocktail is unquestionably an explosive device and throwing the Molotov Cocktail into the building unquestionably caused damage.  Destruction is not the standard, damage is.  As such, the PSR appropriately applies § 2K1.4 to determine a base offense level of 24 for Count Two.

## IV.    APPLICATION OF THE § 3553(a) SENTENCING FACTORS

The Defendant's targeting of an occupied federal building with a homemade firebomb is extremely dangerous criminal conduct that warrants a serious sentence.  Both in selecting appropriate charges to resolve this prosecution by plea agreement, and in recommending an appropriate sentence, the government has given careful consideration to the full range of aggravating and mitigating factors that the Court must consider at sentencing under 18 U.S.C. § 3553(a).  Particularly in this case, which presents some facts and circumstances that could reasonably be viewed as both mitigating and aggravating, the government is mindful that even experienced district court judges may differ in the weight to accord competing factors and what is ultimately a reasonable sentence.  The government is confident, however, that regardless of how much weight the Court accords certain factors, a non-custodial sentence would be objectively unreasonable.

Based on the facts and circumstances presented in this case, the government believes the applicable guideline range of 262 to 327 months is greater than

necessary to comply with the purposes set forth in 18 U.S.C. § 3553(a)(2).  In the
government's view, and for the reasons discussed below, the government
respectfully submits that a sentence of 84 months' imprisonment, would be
sufficient, but not greater than necessary, to achieve the purposes of sentencing
in this case.

### A. THE NATURE AND CIRCUMSTANCES OF THE OFFENSE

The Defendant participated in a planned assault on an occupied federal
building because he did not like the policies of the United States' government.  In
doing so he smashed windows, retrieved a Molotov Cocktail, calmly lit it, and
threw it into the building endangering the lives of two individuals. (Gov't Exh.
3).  The Defendant's weapon of choice – a firebomb – presented a particularly
severe risk of danger because he could not control who or what would be
harmed by it.  The Defendant could not know what was contained in the
building or where it was located.  The Defendant was fortunate that his actions
did not cause more damage to government property or greater injury to human
life.

### B. THE HISTORY AND CHARACTERISTICS OF THE DEFENDANT

The Defendant's history and characteristics present a uniquely difficult task
for the government in recommending sentence, and ultimately for the Court in
selecting the appropriate sentence to impose.  This is because the defendant's
history and characteristics present two significant mitigating factors, but those
same history and characteristics can also be viewed as aggravating factors.

First, the government is not aware of any other instances where the Defendant has used, attempted, or planned the use of violence, intimidation, or coercion to affect or retaliate against government conduct.

Second, the Defendant has two bachelors degrees from the University of Georgia where he graduated magna cum laude as a member of the Phi Beta Kappa Honors Society.  Since his arrest the Defendant has complied with the terms of his probation, and since November 2021 the Defendant has maintained full-time employment where his immediate supervisor says, "he is a good worker who has no history of disciplinary or attendance issues."  (PSR ¶¶ 58 and 61).  Additionally, the government has no reason to dispute any of the Defendant's charitable and employment activity as set forth in the PSR that have not been verified.

While all of the above facts can be viewed as mitigating factors which argue for a lower sentence, they can also be viewed as aggravating factors.  Quite simply, the Defendant should have known better.  He had means and opportunities not afforded many individuals that come before the Court, and his resorting to violence which threatened the lives of hardworking security officers to express his viewpoints, is especially troubling given those facts.

## C. THE PURPOSES OF SENTENCING

The government respectfully submits, that when taken as a whole, a sentence of 84 months' imprisonment is necessary to reflect the seriousness of the Defendant's offense, to promote respect for the law, to provide just punishment, to provide general deterrence to others from engaging in similar conduct, and to

avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct. 18 U.S.C. §§ 3553(a).

As discuss throughout the government's sentencing memo, the Defendant's conduct was abhorrent, placing the lives of innocent people at risk. As a result, the seriousness of the Defendant's offense, the need to promote respect for the law, and to provide just punishment all argue in favor of a sentence above the Government's recommendation of 84 months, as reflected by his guideline range of 262 to 327 months.

In the Court's consideration of both specific and general deterrence, sentencing the Defendant to 84 months' imprisonment is likely more than sufficient to provide specific deterrence to the Defendant such that he is unlikely to reoffend given his history and characteristics. The government's only hesitation in this regard is the lack of contrition and remorse expressed by the Defendant to date, and the Defendant's downplaying of his conduct throughout his objections to the PSR. Additionally, sentencing the Defendant to 84 months' is likely sufficient to provide other similarly situated individuals with general deterrence from engaging in similar criminal conduct, despite whatever grievances they may have with the government or society.

Finally, a sentence of 84 months' imprisonment is broadly consistent with similar sentences imposed for similar offense conduct committed during civil disorder, while taking into account the individual circumstances of the Defendant's conduct. *See United States v. Robinson*, et al., No. 20-CR-181 (D. Minn.) (Four defendants were convicted of conspiracy to commit arson, in

16

violation of 18 U.S.C. § 371, for their roles in the arson of the Minneapolis Police Department's Third Precinct on the night of May 28, 2020. The defendants were sentenced to 48 months', 41 months', 36 months', and 27 months' imprisonment based on their respective levels of involvement it the attack.); *United States v. David-Pitts*, 20-CR-143 (W.D. Wa.) (the defendant was convicted of conspiracy to commit arson, in violation of 18 U.S.C. § 371, for his role in starting a fire against a police precinct door to prevent police officers from exiting the precinct. The defendant was sentenced to 20 months' imprisonment.); *United States v. Jackson*, 20-CR-148 (W.D. Wa.) (Defendant was convicted of two counts of unlawfully possessing Molotov cocktails in violation of 26 U.S.C. §§ 5861(d) and 5845(a)(8) and sentenced to 40 months' imprisonment. The defendant created and used two Molotov cocktails against Seattle Police Department vehicles during a protest on May 30, 2020.)' *United States v. Urooj Rahman*, 20-CR-203 (E.D.N.Y.) (Defendant was convicted of one count of possession of an unregistered explosive device and sentenced to 15 months' imprisonment. The defendant threw a Molotov Cocktail into a NYPD police sedan starting a small fire in the center console of the vehicle, before it was put out two minutes later by responding officers). The Court should take note that in each instance of similar offense conduct the defendant was sentenced to a period of custody. Additionally, in none of the cases cited above was a Molotov Cocktail thrown into an occupied building or vehicle, causing significant risk to life. This factor, which is unique to the Defendant's case, justifies a more significant sentence than those given in the cases cited

17

above.[2]  *See also United States v. King* (https://www.justice.gov/usao-wdmo/pr/kc-man-pleads-guilty-throwing-molotov-cocktails-congressional-office, defendant threw two Molotov Cocktails into an unoccupied congressional office and was sentenced to 10-years' imprisonment); *Mandhai*, 375 F.3d at 1250 (upholding application of sentencing enhancement and endorsing a below guidelines sentence of 140 months where underlying crime was  conspiracy to destroy buildings affecting interstate commerce by means of fire and explosives);

---

[2] During the plea colloquy the Court asked the parties to review sentences given out during the Capital Riots and report any analogous sentences to the Court.  The two most analogous sentences that the Government was able to locate are:

- *United States v. Miller* ( https://www.justice.gov/usao-wdmo/pr/kc-man-pleads-guilty-throwing-molotov-cocktails-congressional-office, Miller threw a full beer can in the direction of the Capitol and police protecting it, he threw batteries towards a tunnel entrance that officers were trying to secure, and he sprayed a fire extinguisher in the direction of officers.  Miller was sentences to 33 months');

- *United States v. Hale-Cusanelli* (https://www.justice.gov/usao-dc/pr/new-jersey-man-sentenced-prison-actions-related-capitol-breach, Hale-Cusanelli was sentenced to 48 months' despite having no physical contact with any law enforcement officers based on being one of the first to enter the capital and encouraging others.  His sentence was also enhanced due to obstruction at trial, which would not be applicable to the Defendant's case)

- *United States v. Hughes*, (https://www.justice.gov/usao-dc/pr/montana-man-sentenced-46-months-prison-actions-during-capitol-breach-including-kicking, Hughes was sentenced to 46 months' for his role in the Capitol Riots which including kicking a senate wing door and screaming at and making aggressive gestures towards officers)

*Christianson*, 586 F.3d 532 (upholding application of terrorist enhancement and sentences of 24 months' and 36 months' respectively for two defendants convicted of destroying government property Forest Service property); *United States v. Harris*, 434 F.3d 767, 773 (5th Cir. 2005)(upholding application of terrorist enhancement and sentence of 240 months' for defendant who threw a Molotov Cocktail into a city municipal building).

**Conclusion**

For the reasons set forth above, the United States requests that the Court sentence the Defendant to a custodial sentence of 84 months.

Respectfully submitted,

RYAN K. BUCHANAN
*United States Attorney*

/s/MATTHEW S. CARRICO
*Assistant United States Attorney*
Georgia Bar No. 538608
matthew.carrico@usdoj.gov

600 U.S. Courthouse, 75 Ted Turner Drive S.W., Atlanta, GA 30303
(404) 581-6000   fax (404) 581-6181

**Certificate of Service**

The United States Attorney's Office served this document today by filing it using the Court's CM/ECF system, which automatically notifies the parties and counsel of record.

John Lovell

January 17, 2023

/s/ MATTHEW S. CARRICO

MATTHEW S. CARRICO

*Assistant United States Attorney*